**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JEFFREY MICHAEL PATAKY,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF PHOENIX, a political subdivision of the State of Arizona; PHILLIP B. GORDON AND JANE DOE GORDON, husband and wife; FRANK FAIRBANKS AND JANE DOE FAIRBANKS, husband and wife; JACK HARRIS AND JANE DOE HARRIS, husband and wife; STEVEN BOECK AND JANE DOE BOECK, husband and wife; THERON QUAAS AND JANE DOE QUAAS, husband and wife; JOHN AND JANE DOES I-X,<br><br>Defendants. | No. CV-09-01483-PHX-JAT<br><br>**ORDER** |

Pending before this Court is Defendants' Motion to Dismiss (Doc. # 19). For the reasons stated below, the Court grants Defendants' Motion to Dismiss, dismisses all claims against all Defendants with prejudice, and denies Plaintiff's request for attorneys' fees and costs.

## BACKGROUND

This case arises out of a search executed by the Phoenix Police Department ("the Department") of the home of Plaintiff Jeffrey Michael Pataky, in accordance with a search

warrant issued by Maricopa County Superior Court Judge Gary Donahoe. The search warrant was based upon a twenty-seven page affidavit detailing the facts supporting the warrant, which are outlined below.

On July 17, 2008, an email was sent to six Department employees in the homicide unit from the email address heather.polombo@alive.com, and signed as if the email were from Department employee Heather Polumbo. This email contained allegedly defamatory and disparaging information about Department homicide detectives Heather Polumbo and Mike Polumbo, and also directed readers to the website www.badphoenixcops.com.

Subsequently, the Department investigated the email, and discovered that someone had removed Mike and Heather Polumbo's nameplates from their workstations inside the homicide unit–a secure and restricted location without public access. The Department also learned that photographs of the nameplates were provided to Pataky and then posted on www.badphoenixcops.com. Photographs of Heather Polumbo's workstation were also posted on the website. Computer forensics conducted by the Department also showed that the photographs were taken by the same type of phone owned by former Department homicide detective David Barnes.

The investigation also uncovered evidence of a relationship between Pataky and Barnes. Numerous emails written by Pataky and Barnes discussed the exchange of photographs. In one such email, dated September 16, 2008, Pataky stated, "U gotta get a potato head photo in his office." Barnes responded to this email, saying, "Great new blogs. Everyone loves them. Some good things are brewing. Please don't post the one about a fly on the wall. Will explain in person. Should have a photo or two for you this weekend."

In April, 2008, Pataky began posting information to the website www.badphoenixcops.com.[1] Since its inception, this website has criticized members of the Phoenix Police Department and Phoenix Police Chief Jack Harris. Pataky's original postings

---

[1] It is unclear whether Pataky claims that he owns the website www.badphoenixcops.com or whether he merely makes posts to the website. However, determining the website's ownership is not necessary for purposes of this decision.

involved allegedly malicious and unfair treatment by the Phoenix Police Department relating to an allegedly trumped up domestic violence offense.

On March 9, 2009, Department officers requested a search warrant from Judge Donahoe to search Pataky's residence. Attached to the warrant was an affidavit indicating that Pataky was suspected of computer tampering[2] and theft.[3] During the search, officers removed electronic storage devices, business and personal computers, modems, wireless routers, and entered Pataky's safe to remove thumb drives, documents, and personal identification. The officers also removed documents pertaining to a separate, pending lawsuit. As of the time of the filing of his Complaint, Pataky has not been charged with any crime.

The search warrant affidavit recounts numerous connections between Pataky and Barnes. The affidavit detailed records of telephone conversations between Pataky and Barnes and emails discussing obtaining photographs. Computer forensics conducted by the Department also showed that the photographs were taken by the same type of phone owned by Barnes. The affidavit also outlined security camera footage from after the nameplates were stolen, showing Pataky in front of a hotel in Los Vegas holding two unknown items and being photographed in front of the conference room for the "Arizona Homicide Investigators Assn. Meeting." A photograph of the stolen name plates in front of the Gold Coast Hotel, and a photograph of the stolen name plates in front of the "Arizona Homicide Investigators Assn. Meeting" were posted on www.badphoenixcops.com.

---

[2]A.R.S. § 13-2316(A)(5) defines Computer Tampering as: "Recklessly using a computer, computer system or network to engage in a scheme or course of conduct that is directed at another person and that seriously alarms, torments, threatens or terrorizes the person. For the purposes of this paragraph, the conduct must both: (a) Cause a reasonable person to suffer substantial emotional distress [and] (b) Serve no legitimate purpose."

[3]A.R.S. § 13-1802(A)(5) provides: "A person commits theft if, without lawful authority, the person knowingly: . . . . Controls property of another knowing or having reason to know that the property was stolen."

Pataky brought this suit, alleging abuse of process in violation of 42 U.S.C. § 1983; abuse of process under Arizona law; intentional infliction of emotional distress; harassment; violation of the Privacy Protection Act of 1980; and violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510–2522. All Defendants except Quaas and Boeck filed a Motion to Dismiss, (Doc. # 19), and Quaas and Boeck subsequently joined in this motion. (Doc. # 20). Pataky responded, and requests attorneys' fees and costs incurred in responding to Defendants' Motion to Dismiss.[4] (Doc. # 27, at 2).

**ANALYSIS**

In order to survive a Rule 12(b)(6) motion, a plaintiff only need provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). In pleading the grounds of the claim, the plaintiff need not provide "detailed factual allegations," however, the plaintiff must plead enough facts "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Factual allegations that are consistent with lawful conduct are insufficient to state a claim. *Id.* at 557. Such allegations are neutral and do not suggest "plausible liability" on the claim. *See id.* at 557 n. 5 (recognizing a line "between the factually neutral and the factually suggestive," which "must be crossed to enter the realm of plausible liability").

Rule 8 demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). A complaint that offers nothing more than naked assertions will not suffice. To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 129 S.Ct. at

---

[4] Pataky's request for attorneys' fees and costs appears without any support and without any argumentation as to why he is entitled to such an award. Nevertheless, because the Court ultimately grants Defendants' Motion to Dismiss, the Court denies Pataky's request.

- 4 -

1949. Facial plausibility exists if the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Plausibility does not equal "probability," but plausibility requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal quotations omitted).[5]

In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. *See Harrell v. United States*, 13 F.3d 232, 236 (7th Cir.1993). *See also* 2 MOORE'S FEDERAL PRACTICE, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)."). The focus of any Rule 12(b)(6) dismissal–both in the trial court and on appeal–is the complaint. *Schneider v. California Dept. of Corr.*, 151 F.3d 1194 n.1 (9th Cir. 1998).

However, additional facts, when contained in a document referenced by the plaintiff in his complaint, may be considered. "A court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy

---

[5]In Pataky's Response, he concedes that he failed to state specific factual allegations supporting claims against Fairbanks and Gordon, and agrees to dismiss such claims without prejudice. (Doc. # 27, at 4–5). Although Pataky alleged that Fairbanks holds the position of City Manager for the City, and that Gordon holds the position of Mayor in and for the City, he failed to state any facts attributing conduct to Fairbanks and Gordon or connecting them in any way to any of Pataky's alleged injuries. With regard to Quaas and Boeck, Pataky never alleged facts supporting a claim that either Quaas or Boeck undertook conduct about which Pataky complains. Although Pataky alleged that Quaas was a Detective in the Department's Family Investigations Bureau, and that Boeck was a Department employee, Pataky failed to state any facts attributing conduct to Quaas or Boeck, or connecting them in any way to any of Pataky's alleged injuries. Thus Pataky failed to state any facts sufficient to state a claim against Quaas or Boeck.

attached to the 12(b)(6) motion. . . . The court may treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). Consideration of these additional facts does not convert a 12(b)(6) motion into a motion for summary judgment. *Kourtis v. Cameron*, 419 F.3d 989, 994 (9th Cir. 2005) ("[C]ourt records from related proceedings can be taken into account without converting a motion to dismiss into a summary judgment motion.") (citing *Shaw v. Hahn*, 56 F.3d 1128, 1129 n. 1 (9th Cir. 1995)), abrogated on other grounds by *Taylor v. Sturgell*, 128 S.Ct. 2161 (2008).

Here, Defendants attached the search warrant affidavit to their Motion. The Court may consider the evidence contained in the search warrant, because all three *Marder* factors are satisfied here. First, Pataky's Complaint refers to the search warrant, (Doc. # 1, at ¶ 19, 20, 21, 26, 29, 30, 40, 46, 55). Next, the search warrant affidavit is central to Pataky's claim, because the critical issue whether there was probable cause for the search warrant, cannot be decided in Pataky's favor without considering if there were sufficient facts to warrant a prudent man in believing that Pataky committed or was committing a criminal offense. Finally, no party questions the authenticity of the copy of the search warrant that Defendants attached. In fact, Pataky references the search warrant numerous times in his Response. (Doc. # 27, at 4, 6, 7*).* Accordingly, consideration of the search warrant affidavit does not convert Defendants' 12(b)(6) motion into a motion for summary judgment.

*Count 1: Abuse of Process in Violation of 42 U.S.C. § 1983*

Pataky alleges that Harris and the City abused process in violation of 42 U.S.C. § 1983 by acting with malice in obtaining and executing the search warrant, and by so doing violated his Fourth Amendment Rights, substantive due process rights, and his First and Fourteenth Amendment Rights.[6]

---

[6]It is unclear whether a claim for abuse of process may even be maintained under § 1983, since abuse of process is a state law tort. *See Albright v. Oliver*, 510 U.S. 266, 274–75

"To sustain an action under § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Here, the parties agree that the actions taken were done under color of state law. However, they disagree whether the conduct deprived Pataky of a constitutional right.

## FOURTH AMENDMENT

Pataky fails to state facts sufficient to support a claim for violation of his Fourth Amendment Rights because the search warrant was supported by probable cause. Probable cause is defined as "facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (citation and quotations omitted). "Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt." *Wartson v. United States*, 400 F.2d 25, 27 (9th Cir. 1968) (citation and internal quotation marks omitted)).

Another court's "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). "A court must uphold a warrant if, 'under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed.'" *United States*

---

(1994) (noting that the tort of malicious prosecution under § 1983 is not available when there is a comparable state law tort available); *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001) (noting that satisfying the elements of a state law tort of malicious prosecution is not the foundation of a constitutional tort for purposes of a §1983 claim, but rather knocks out any constitutional tort of malicious prosecution, because when a state law remedy exists, due process of law is afforded by the opportunity to pursue a claim in state court). *But see Savino v. City of New York*, 331 F.3d 63, 76–77 (2d Cir. 2003) ("Malicious abuse of criminal process also supports liability under § 1983."). The Court assumes–without deciding–that such a claim exists.

*v. Celestine*, 324 F.3d 1095, 1102 (9th Cir. 2003) (quoting *United States v. Schmidt*, 947 F.2d 362, 371 (9th Cir. 1991)).

"Probable cause to search exists when there is a 'substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing.'" *United States v. Elliot*, 322 F.3d 710, 715 (9th Cir. 2003) (quoting *Gates*, 462 U.S. at 236). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Gates*, 462 U.S. at 235 (internal quotation marks omitted).

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." *Gates*, 462 U.S. at 236. "An affidavit in support of a search warrant demonstrates probable cause if, under the totality of the circumstances, it reveals a fair probability that contraband or evidence of a crime will be found in a particular place." *Celestine*, 324 F.3d at 1102 (citing *Gates*, 462 U.S. at 238). When interpreting the scope of the warrant, the Court will not interpret the affidavit "in a hypertechnical, rather than commonsense manner." *Gates*, 462 U.S. at 236.

Given that the Court must give "great deference" to the state court's determination, *Gates*, 462 U.S. at 236, the Court finds that there was sufficient support in the affidavit to conclude that there was probable cause to issue the search warrant. The search warrant affidavit recounts numerous connections between Pataky and Barnes. It detailed records of telephone conversations between them and emails discussing obtaining photographs. It also outlined security camera footage after the nameplates were stolen, showing Pataky in front of a hotel in Las Vegas holding two unknown items and being photographed in front of the conference room for the "Arizona Homicide Investigators Assn. Meeting."A photograph of the stolen name plates in front of the Gold Coast Hotel, and a photograph of the stolen name plates in front of the "Arizona Homicide Investigators Assn. Meeting" were posted on www.badphoenixcops.com. Video surveillance footage from the Gold Coast Hotel in Las

Vegas showed Pataky taking a photograph with two unknown objects in his hands. Later, photographs were posted on badphoenixcops.com showing the name plates in the exact location of the pictures witnessed by the video surveillance. Pataky and Barnes exchanged numerous phone and email conversations discussing photographs. Forensic examination showed that Barnes took the photos Pataky posted.

All of these facts–and the others contained in the twenty-seven pages of small print in the affidavit–are sufficient, under the totality of the circumstances, to reveal a fair probability that contraband or evidence of the crime of computer tampering or theft would be found at Pataky's residence, and there was a substantial basis for Judge Donahoe to conclude that a search would uncover evidence of wrongdoing.[7]

## SUBSTANTIVE DUE PROCESS

Pataky alleges that Harris and the City violated 42 U.S.C. § 1983 abuse of process. Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S. 266, 271–72 (1994). "[A] person injured as a result of police misconduct may prosecute a substantive due process claim under section 1983." *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996) (noted by *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). Here, because the search warrant was supported by probable cause, Pataky has

---

[7]Pataky alleges that during the search officers seized paperwork and other documents not listed under the warrant and privileged communications with his counsel regarding Pataky's pending suit against the Department. While Pataky alleges these issues, he does nothing more than state bare legal conclusions without a reasonable factual basis. He does not identify the papers taken or demonstrate how they were unrelated to the content of the search warrant, which permitted seizure of any evidence tending to show that a public offense had been committed. Under *Twombly* and *Iqbal* this speculation is not enough to survive a motion to dismiss.

failed to allege any police misconduct. Therefore, his claim against Harris and the City for violation of 42 U.S.C. § 1983 in violation of his substantive due process rights should be dismissed.

FIRST AMENDMENT AND FOURTEENTH AMENDMENT

Because the search was supported by probable cause, Pataky fails to state a claim that the search violated his First and Fourteenth Amendment Rights. Factual allegations that are consistent with lawful conduct are insufficient to state a claim against a party for violation of the party's rights. *Twombly*, 550 U.S. at 557. Pataky's factual allegations reveal only that the officers acted appropriately in their search of his residence.

*Count 2: Abuse of Process Under Arizona Law*

Pataky alleges that the City and Harris abused process in violation of Arizona law by obtaining and executing the search warrant. A plaintiff states a claim for abuse of process when he can show the defendant committed "'(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings.'" *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 887 (Ariz. Ct. App. 2004) (citing *Nienstedt v. Wetzel*, 651 P.2d 876, 881 (Ariz. Ct. App. 1982)). S*ee also Morn v. City of Phoenix*, 730 P.2d 873, 876 (Ariz. Ct. App. 1986) (holding, in abuse of process claim asserted by police officers, that evidence indicated that mother used legal process in filing suit against police officers primarily to seek redress for wrongs believed by her to have been perpetrated upon herself and her children by the officers in the course of a residential search, along with the possible incidental purpose of "getting even" for those alleged wrongs, rather than to obtain a collateral advantage in aborting an ongoing criminal investigation of her husband or to engage in any form of extortion, as alleged by officers).

In order to avoid "frivolous, unfounded, or ill-defined [abuse of process] claims," Arizona courts mandate two additional requirements in order to establish abuse of process: (1) the primary motive requirement and (2) the improper purpose requirement. *Crackel*, 92 P.3d at 889. In order to satisfy the primary motive requirement "a claimant must present more than mere speculation to support the assertion that the defendant has used court

processes with an improper intent. Instead, a plaintiff must show that the defendant's improper purpose was . . . not merely an incidental motivation." *Id.* (citing *Nienstedt*, 651 P.2d at 882). The *Crackel* Court noted that "'there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus, the entirely justified prosecution of another on a criminal charge . . . does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm.'" (citing RESTATEMENT (SECOND) OF TORTS § 682 cmt. b (1977)). It is not enough for a plaintiff to allege that the defendants gained "some secondary gain or emotional satisfaction." *Crackel*, 92 P.3d at 889.

The improper purpose requirement mandates that a plaintiff must show that "the defendant took an action that could not logically be explained without reference to the defendant's improper motives." *Id.* "Liability should result only when the [defendant's] sense of awareness progresses to a sense of purpose, and, *in addition the utilization of the procedure for the purposes for which it was designed becomes so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure.*" *Id.* (emphasis in original).

Here, Pataky failed to allege facts sufficient to state an abuse of process claim under Arizona law. He asserts that the City and Harris instigated the investigation and subsequent execution of the search warrant in retaliation against him for critical blog postings on www.badphoenixcops.com and in retaliation for litigation regarding allegedly malicious acts of the police officers involved in a separate matter. According to Pataky, "upper echelon" Department employees can confirm the fact that the investigation was merely a "rouse," and the fact that no criminal charges have been filed against him at the present moment shows the abusive nature of the search warrant.

Pataky's complaint does not satisfy the primary motive requirement. He failed to allege anything more than mere speculation to support his assertion that Harris or the City used court processes with an improper intent, and that retaliation was not merely an

- 11 -

incidental motivation. The search warrant was supported by probable cause, and was used for the purpose it was intended: to further an investigation of suspected wrongdoing. Even if Pataky could demonstrate that Harris and the City instigated the investigation in order to retaliate, this would demonstrate nothing more than that the City or Harris received some secondary gain or emotional satisfaction from it, which is not enough to maintain an action for abuse of process.

Furthermore, allegations of retaliation do not constitute an improper purpose. Based upon the facts Pataky alleges, Harris's and the City's actions can still logically be explained without reference to their allegedly retaliatory motive. An ongoing investigation regarding the impersonation of Department employees and the potential theft of Department resources, led to the requesting of a search warrant, alleging that Pataky was suspected of committing computer tampering and possessing stolen property.[8]

*Count Three: Intentional Infliction of Emotional Distress*

Pataky also fails to state facts sufficient to support a claim for intentional infliction of emotional distress. In order to establish a claim for intentional infliction of emotional distress under Arizona law a plaintiff must show "*first*, the conduct by the defendant must be 'extreme' and 'outrageous'; *second*, the defendant must either intend to cause emotional

---

[8]Inherent in Pataky's contention that the search warrant was merely a "rouse" because no criminal prosecution has resulted as of the date of filing his Response to Defendants' Motion to Dismiss, is the incorrect assumption that a search warrant can only be valid when it subsequently blossoms into a criminal prosecution. This assumption is false because the standard an officer must meet in order to have a search warrant granted and the standard a prosecuting attorney must meet to file a criminal prosecution are significantly different. Just because an officer may have a bourgeoning suspicion sufficient to justify a search warrant, a prosecuting attorney may not think that same suspicion sufficient to blossom into a criminal prosecution. Further, the fact that a criminal prosecution has not been filed as of a particular date subsequent to a search warrant does not mean that a criminal prosecution *could never* be filed based upon the evidence gathered under the search warrant. Ongoing investigations do not require prosecution at the earliest moment that evidence sufficient for prosecution exists.

1  distress or recklessly disregard the near certainty that such distress will result from his
2  conduct; and *third*, severe emotional distress must indeed occur as a result of defendant's
3  conduct." *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987) (citing *Watts v. Golden Age
4  Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)).

Conduct is "extreme" and "outrageous" when a defendant acts in a manner "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995) (citations omitted). *See also Midas Muffler Shop v. Ellison*, 650 P.2d 496, 502 (Ariz. Ct. App. 1982) (holding that a collection agency's use of vulgar language was not outrageous enough to sustain a claim of intentional infliction of emotional distress and citing illustrative examples in collections from other jurisdictions where "fright caused by collecting agent's conduct resulted in premature birth of dead baby[;] conduct caused plaintiff to be found writhing in bed in a state of extreme shock and hysteria[;] [and later] suffered severe nervousness and headaches resulting in such a breakdown of her physical and emotional well being that she was unable thereafter to perform her job[;] plaintiff suffered severe headaches and stress and her state of anxiety ultimately required hospitalization[;] [and] telephone calls to plaintiff who suffered from multiple sclerosis caused stress and a relapse resulting in a permanent impairment of her condition); *Reed v. Mitchell & Timbanard, P.C.*, 903 P.2d 621, 626 (Ariz. Ct. App. 1995) (holding that "simple legal malpractice resulting in pecuniary loss which in turn causes emotional upset, even with physical symptoms, will not support a claim for damages for emotional distress").

Here, the search of Pataky's residence under a search warrant supported by probable cause and the subsequent seizure of Pataky's property were not so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Searches executed under valid search warrants occur regularly in our society and are an important function of police officers in combating crime. Although Pataky alleges that Harris's and the City's actions were

1 "extreme and outrageous" and that he suffered "severe emotional distress," he has failed to
2 allege any facts supporting these legal conclusions.[9]

*Count Four: Harassment*

Although Pataky alleged that Harris and the City committed acts of harassment, he fails to direct the Court to any authority supporting a tort for harassment under Arizona law. Defendants asserted that no such tort exists under Arizona law, and Pataky failed to respond to this assertion and therefore has abandoned this argument, justifying its dismissal. *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (holding that a party abandoned claims not defended in opposition to a motion for summary judgment).

Even if Pataky had not abandoned the claims, and even if harassment were a cognizable tort under Arizona law, the actions of the officers–executing a search warrant supported by probable cause and seizing property in accordance with that search warrant–would not subject them to such a harassment claim. It would be quixotic that the everyday actions of police officers around the country could constitute harassment under this hypothetical tort.

*Count Five: Violation of Privacy Protection Act of 1980*

Although initially Pataky alleged that all Defendants violated the PPA, he later agreed with Defendants that his PPA claim could only lie against the City, based upon 42 U.S.C. § 2000aa-6 (providing no right of action against individual actors when state had waived sovereign immunity) and *Davis v. Gracey*, 111 F.3d 1472, 1482 (10th Cir. 1997) ("The PPA

---

[9]Pataky does allege that during the search of his residence, officers restrained his roommate, Christine Lavan. Pataky alleges that the officers handcuffed her, forced her to remain in Pataky's residence during the course of the search, and denied her access to counsel despite her repeated requests for one. The Court notes that Christine Lavan is not a party to this suit, and, without deciding that the above conduct would constitute "extreme" or "outrageous" conduct, Pataky could not assert a claim of intentional infliction of emotional distress on her behalf. Further, without deciding that the above conduct inflicted upon Christine and any resultant interference in their roommate relationship would constitute "extreme" or "outrageous" conduct, the Court notes that Pataky did not allege that the officers' actions toward Christine caused any emotional distress to him.

- 14 -

by its terms does not authorize a suit against municipal officers or employees in their individual capacities."). (Doc. # 27, at 5). The Court notes, without deciding here, that Pataky continues only to maintain a PPA claim against the City.

The Privacy Protection Act (PPA), 42 U.S.C. § 2000aa–2000aa-12, was enacted in response to the Supreme Court's holding in *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), that the Fourth Amendment confers no special protections against search and seizure for the possessor of documentary evidence who is not a suspect in the offense under investigation. It was enacted to afford "the press and certain other persons not suspected of committing a crime with protections not provided currently by the Fourth Amendment." *Guest v. Leis*, 255 F.3d 325, 340 (6th Cir. 2001) (citing legislative history). It prohibits "a government officer or employee, in connection with the investigation or prosecution of a criminal offense" from searching or seizing "work product materials"[10] that are "possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce." 42 U.S.C. § 2000aa(a). The PPA can protect computer records. *Guest*, 255 F.3d at 340.

---

[10]In 42 U.S.C. § 2000aa-7(b), Congress defines "work product materials" in the following way:

(b) "Work product materials", as used in this chapter, means materials, other than contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used, as the means of committing a criminal offense, and--

(1) in anticipation of communicating such materials to the public, are prepared, produced, authored, or created, whether by the person in possession of the materials or by any other person;

(2) are possessed for the purposes of communicating such materials to the public; and

(3) include mental impressions, conclusions, opinions, or theories of the person who prepared, produced, authored, or created such material.

The PPA's protections do not apply when, *inter alia*, the person possessing the materials is a criminal suspect–rather than an innocent third party–and the police have probable cause. 42 U.S.C. §2000aa(a)(1) (the PPA's protections do not apply when "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate: *Provided, however*, That a government officer or employee may not search for or seize such materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein . . . .") (italics in original); *United States v. Mittelman*, 999 F.2d 440, 443 (9th Cir. 1993) ("[The PPA] does not apply to criminal suspects . . . nor does it require any showing greater than probable cause in order to secure a warrant for a search which might intrude upon confidential relationships."); *see DePugh v. Sutton*, 917 F.Supp. 690, 695-96 (W.D. Mo. 1996) ("The [PPA] clearly allows the government to depart from the requirements of the Act in those instances in which the person suspected of a crime is in possession of documents related to the crime. This interpretation is also in keeping with the purpose of the [PPA] as enunciated in its legislative history."); *Berglund v. City of Maplewood*, 173 F.Supp.2d 935, 949 (D. Minn. 2001) (holding that the suspect exemption of PPA applied to officers' actions where police officers' warrantless seizure, viewing, and copying of a videotape from the hosts of a local public access television show after one host recorded his confrontation with the police in the past that resulting in his arrest). This is known as the suspect exemption.[11] The materials exempted by the suspect exemption must relate to the offense and the offense

---

[11] The PPA also applies the suspect exception to its protection of "other documents." 42 U.S.C. §2000aa(b)(1). "Documentary materials" are "materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense." *Id.* at §2000aa-7(a).

must not involve the communication of the materials. 42 U.S.C. § 2000aa(a)(1). The PPA's remedy is exclusive, 42 U.S.C. §2000aa-6(d), and a successful litigant is entitled to recover damages, attorneys' fees and litigation costs. 42 U.S.C. §2000aa-6(f).[12]

Here, because the search warrant was supported by probable cause and because Pataky was a suspect in a criminal investigation–rather than an innocent third party–the PPA's protections do not apply. Pataky might argue that the suspect exemption should not apply here because his suspected offense was one consisting of the receipt, possession, communication, or withholding of protected materials under the PPA. However, Pataky was suspected of computer tampering and theft, neither of which could be categorized as punishing the receipt, possession, communication, or withholding of protected materials. All of the materials seized by the City relate to Pataky's suspected offenses, and those offenses do not involve the communication of the materials, but rather involve computer tampering and theft.[13]

Therefore, Pataky has failed to allege any facts sufficient to support his PPA claim against the City.

*Count Six: Violation of Electronic Communications Privacy Act*

Pataky failed to defend his allegation that Defendants violated the Electronic Communications Privacy Act ("ECPA") after Defendants asserted it should be dismissed. This failure to respond constitutes abandonment, justifying dismissal. *See Jenkins*, 398 F.3d at 1095 n.4.

Alternatively, even if he did not abandon his ECPA claim, Pataky failed to allege any facts sufficient to support it. The ECPA, 18 U.S.C. § 2510–2522, "generally protects the

---

[12] Although the Court ultimately dismisses Pataky's PPA claim, the Court does note that if it were to permit Pataky's PPA claim against the City, that would constitute an additional ground for dismissing all of Pataky's other claims.

[13] The parties also disputed whether Pataky's actions on www.badphoenixcops.com constitute interstate commerce, but since the Court holds that the PPA does not protect Pataky here, the Court need not decide the further issue of whether the postings to the website were in interstate commerce.

1 parties to a communication against the unlawful interception, use, and disclosure of that
2 communication by persons who are not parties to the communication." *United States v.*
3 *Reed*, 575 F.3d 900, 916 (9th Cir. 2009). An "electronic communication" is defined as "any
4 transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature
5 transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or
6 photooptical system." 18 U.S.C. § 2510(12). Courts distinguish between the "interception"
7 of an electronic communication at the time of transmission from the retrieval of the
8 communication after it is put into electronic storage. *Konop v. Hawaiian Airlines, Inc.*, 302
9 F.3d 868, , 874, 877-78 (9th Cir. 2002) (holding, after noting that "the existing statutory
10 framework is ill-suited to address modern forms of communication," that the ECPA only
11 applies to "acquisition contemporaneous with transmission" because "Congress did not
12 intend for 'intercept' to apply to 'electronic communications' when those communications
13 are in 'electronic storage') (citation omitted); *Steve Jackson Games, Inc. v. United States*
14 *Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994) (holding that government's acquisition of
15 email messages stored on an electronic bulletin board system, but not yet retrieved by the
16 intended recipients, was not an "interception" under the ECPA).

17 Pataky asserts that the "Defendants in this matter have intentionally intercepted the
18 electronic communications of Plaintiff which affected interstate commerce." (Doc. # 1, at
19 12). However, he fails to state any facts sufficient to support this legal conclusion, because
20 none of the facts Pataky alleged against the Department constitute an interception. Although
21 Pataky alleges that the Department's officers seized electronic storage data from his house,
22 that electronic storage data is electronic communication that is stored and not in transmission,
23 and thus not an interception. The Department also gathered information from telephone
24 records requests, video surveillance, email record requests to both Microsoft and Google,
25 computer forensics performed on pictures posted on www.badphoenixcops.com, and
26 searches of IP addresses. These were all variously executed under search warrants and grand
27 jury subpoenas, the validity of which Pataky has not contested. All of these, however, are
28 also not sufficient to constitute interceptions. Therefore, Pataky has failed to plead enough

facts to raise a right to relief above the speculative level, and thus his ECPA claim must be dismissed.

## CONCLUSION

Because Pataky has failed to allege any facts sufficient to state *any* of his claims, the Court grants Defendants' Motion to Dismiss.

**IT IS ORDERED** granting Defendants' Motion to Dismiss (Doc. # 19).

**IT IS FURTHER ORDERED** dismissing all claims against Defendants CITY OF PHOENIX; PHILLIP B. GORDON AND JANE DOE GORDON; FRANK FAIRBANKS AND JANE DOE FAIRBANKS; JACK HARRIS AND JANE DOE HARRIS; STEVEN BOECK AND JANE DOE BOECK; THERON QUAAS AND JANE DOE QUAAS; and JOHN AND JANE DOES I-X.

**IT IS FURTHER ORDERED** denying Plaintiff's request for attorneys' fees and costs associated with responding to Defendants' Motion to Dismiss.

DATED this 7th day of December, 2009.

James A. Teilborg
United States District Judge